### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-CV-61067-RAR

**POLAR VORTEX, LLC**,

     Plaintiff,

v.

**CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON SUBSCRIBING TO POLICY
YHL1700840**,

     Defendant.

_____/

### <u>ORDER ON BENCH TRIAL</u>

In September of 2017, Hurricane Irma devastated the Caribbean islands. One of the storm's victims was a catamaran called the "Polar Vortex," owned by Plaintiff in this matter, Polar Vortex, LLC. This cause is now before the Court following a bench trial in which Plaintiff seeks to recover the original value of the Polar Vortex from its insurance provider, after years of unsuccessful repairs. Without reaching the merits of the action, the Court finds that Plaintiff's lawsuit is untimely based on the terms of the agreed upon insurance policy. For that reason, Defendant is entitled to judgment in its favor.

### <u>BACKGROUND</u>

#### I. Factual Background

Plaintiff Polar Vortex, LLC ("Insured"), is a U.S. Virgin Islands limited liability company. Joint Pretrial Stipulation ("Stip."), [ECF No. 46] ¶ A at 5. Polar Vortex, LLC is the owner of the Polar Vortex ("Vessel"), a 2014 57' Fontaine Pajot catamaran sailing vessel bearing Hull Identification Number FPA 54031G314. *Id.* ¶ B at 5. On September 5, 2017, the Polar Vortex was docked at her berth at Compass Point Marina, St. Thomas, U.S. Virgin Islands. *Id.* ¶ J at 6.

Between the dates of September 5 and September 6, 2017, Hurricane Irma struck the island of St. Thomas.  During the hurricane, the Polar Vortex broke loose from her mooring.  *Id.* ¶ K at 6.  The Vessel was impaled by a piling, creating a four-foot by seven-foot hole, and it was submerged underwater.  Tr. III at 14:6–8, 99:6–13.

Certain Underwriters at Lloyd's of London Subscribing to Policy YHL1700840 ("Underwriters"), issued the Marine Yacht Insurance Policy No. YHL1700840 ("Policy") for the Polar Vortex, effective from February 23, 2017, through February 23, 2018.  Stip. ¶ C at 6.  The Policy included Hull & Machinery coverage (Agreed Value) of $1,000,000 and Protection & Indemnity coverage of $1,000,000, as well as separate coverage for each of the Vessel's tenders and for sue and labor.  *Id.* ¶¶ D–F at 6.  Salvage costs are paid separate from the agreed value under the Policy, and Sue & Labor expenses, even if unsuccessful, are payable in addition to the hull value.  *Id.* ¶¶ L–M at 6.  Damage caused by Hurricanes and Windstorms are covered losses under the Policy.  *Id.* ¶ G at 6.  The Policy defines a Constructive Total Loss where the "expense of recovering and repairing the [V]essel shall exceed the amount of insurance on hull and machinery."  *Id.* ¶ H at 6.  The Policy's deductible clause provides that the deductible amount shall not apply in the event of a "Total Loss" or "Constructive Total Loss," unless the Vessel is damaged due to a named windstorm—in which case a $50,000 deductible shall apply.  *Id.* ¶ I at 6.

The Polar Vortex was moved from her berth in St. Thomas, U.S. Virgin Islands to Fort Lauderdale, Florida.  Joint Exhibit ("Ex.") J-17 at 2.  The costs incurred to raise the Polar Vortex, patch it, and pump it to keep it afloat are Sue & Labor expenses covered under the Policy.  Stip. ¶ N at 6.  There is no deductible for Sue & Labor expenses.  *Id.* ¶ O at 7.

Repairs of the Polar Vortex were made from December 2017 until May 2019.  Ex. J-26.  During that time, Bosch Marine Yacht Services, LLC ("Bosch Marine") served as the repair contractor and project manager.  *See* Ex. J-24.  After a year and a half of attempting to repair the

Vessel, Polar Vortex, LLC submitted a formal Notice of Tender of Abandonment and Sworn Proof of Loss on June 17, 2019, which Underwriters rejected.  Stip. ¶ S at 7.   The Insured renewed its Notice of Tender of Abandonment in August 2020.  *Id.* ¶ T at 7.  Underwriters rejected this Tender of Abandonment in September 2020.  *Id.* ¶ U at 7.

## II.  Procedural History

Plaintiff filed the instant Complaint, [ECF No. 1], on June 6, 2022.  However, the parties agree that the Complaint relates back to the original complaint filed in Case No. 20-61978 in the Southern District of Florida on September 29, 2020.  *See* FED. R. CIV. P. 15(c)(1)(B) ("An amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.").

Defendant filed a Motion to Dismiss the instant Complaint on July 15, 2023, *see* [ECF No. 4], which the Court granted in part and denied in part, *see* Order on Motion to Dismiss ("MTD Order"), [ECF No. 27].  Defendant argued that given the Policy provided a one-year limitations period, Plaintiff's Complaint was time-barred because the date of loss was September 5–6, 2017, and all purported breaches of contract occurred over year before the case was first filed.  *See* MTD Order at 9.  Plaintiff argued the "continuing violations doctrine" tolled this provision of the Policy until Defendant's most recent violation, which occurred less than a year before Plaintiff filed suit. *See id.*  The central question the Court addressed was whether Defendant's August 17, 2020, and/or August 26, 2020 decisions to again reject Plaintiff's Tender of Abandonment constituted new wrongful acts or whether they were the mere continuation of Defendant's initial rejection of the Plaintiff's Notice of Tender of Abandonment on June 17, 2019.  *Id.* at 10.  Applying the Motion to Dismiss legal standard and construing all facts in the light most favorable to Plaintiff, the Court held the Complaint was not time-barred.  *Id.* at 11.

Defendant again raised the argument that the case was time-barred in its Motion for Summary Judgment. [ECF No. 32]. The Court held a hearing on Defendant's Motion for Summary Judgment on May 3, 2023, [ECF No. 57], and on May 4, 2023, the Court issued an Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment ("MSJ Order"), [ECF No. 58]. This time, the Court concluded there were genuine disputes of material fact that foreclosed summary judgment on the question of whether the case was time-barred. MSJ Order at 2. Specifically, the Court identified at least two factual issues: (1) whether Plaintiff, the insured, ever elected to repair the Polar Vortex beyond simply salvaging the Vessel; and (2) whether Defendant, the insurer, continued to adjust Plaintiff's claim after Plaintiff first tendered a Notice of Abandonment on June 17, 2019, thereby extending the limitations period for Plaintiff to bring suit. *Id.* at 2–3. Accordingly, these questions of fact were of utmost importance at trial.

### III.   Trial

Following the Court's Summary Judgment Order, this case proceeded to a six-day bench trial held on May 15, 16, 22, 23, 24, and 25, 2023. *See* Trial Tr. vol. 1 ("Tr. I"), [ECF No. 81]; Trial Tr. vol. 2 ("Tr. II"), [ECF No. 82]; Trial Tr. vol. 3 ("Tr. III"), [ECF No. 83]; Trial Tr. vol. 4 ("Tr. IV"), [ECF No. 84]; Trial Tr. vol. 5 ("Tr. V"), [ECF No. 85]; Trial Tr. vol. 6 ("Tr. VI"), [ECF No. 86]; Trial Tr. vol. 7 ("Tr. VII"), [ECF No. 87]. At trial, the parties presented evidence related to the question of whether the case is time-barred, as well as the merits of the underlying claims. Although the Court has considered all the evidence presented at trial, it will only address whether the case is time-barred.

Three of the witnesses who testified at trial provided evidence relevant to the question of whether this matter is time-barred. Plaintiff called all three witnesses in its case-in-chief: Ian Seigel (the representative and claims handler at Underwriters), Neil Maclaren (a marine surveyor reporting to Underwriters regarding the Polar Vortex), and Carey Drangula (Polar Vortex, LLC's

representative and corporate attorney).  Defendant agreed with the Court that Plaintiff called all the witnesses relevant to the time-bar affirmative defense.  Tr. IV at 5:15–24 (The Court: "Does the defense team believe, given the way in which we've structured the witnesses, that at the conclusion of the Plaintiff's case, those witnesses with knowledge regarding your defense of [contractual] limitations will have been heard from?"  Defense Counsel: "100 percent, Your Honor."  The Court: "So the universe of testimony that I would need should be in front of me once Plaintiff rests, right?"  Defense Counsel: "Correct, Your Honor.").  Accordingly, the Court summarizes only the testimony of Mr. Seigel, Mr. Maclaren, and Ms. Drangula.

### a. Ian Seigel

Ian Seigel is a specialty claims manager with Antares Managing Agency, which is a syndicate of Defendant Underwriters, and he testified as the designated corporate representative for Defendant.  Tr. I at 50:13–51:18.  Mr. Seigel was the claims representative and adjuster for Underwriters with respect to the Policy issued to Polar Vortex, LLC.  Tr. I at 51:5–9.  As the claims adjuster, his duties were to "adjust the claim under the terms of the Policy, to evaluate coverage provided under the Policy, and to ensure that any costs presented are fair and reasonable" and "review…[a]ny submission for payment that [is] to be made."  Tr. I at 58:24–59:9.

When the Polar Vortex was damaged by Hurricane Irma, representatives from Polar Vortex, LLC reached out to Mr. Seigel regarding the Policy.  Tr. I at 147:3–8.  Mr. Seigel testified that at the instruction of Underwriters, a surveyor, Will Howe, initially inspected the Vessel in St. Thomas, investigated the loss, and prepared a preliminary report which he sent to Mr. Seigel.  Tr. I at 152:24–153:10; *see* Ex. J-28.  At the time, Mr. Howe estimated the damage would cost $395,000 to repair and an additional $45,000 to salvage the Vessel.  Tr. I at 152:1–7.  Thereafter, Mr. Seigel adjusted the claims throughout the salvage and repair process.

As of January 26, 2019, Underwriters knew that Plaintiff's repair costs appeared to exhaust the $1 million Policy limit. Tr. II at 44:16–45:6, 51:14–17. Even though the repair costs exceeded the Policy limit, Mr. Seigel did not agree that the Vessel could be considered a "Constructive Total Loss" at that time. *Id.* Mr. Seigel explained that since Polar Vortex, LLC had already "gone down the repair route" it was "a case of paying whatever is left under that policy limit," and Plaintiff cannot "get a [Constructive Total Loss] on top of what's already been paid." Tr. II at 45:1–3. Mr. Seigel did not inform the Insured that their costs had exceeded the Policy limit because said costs were submitted by the Insured itself, so Mr. Seigel believed the Insured already knew the costs were on pace to exceed the Policy limit. Tr. II at 45:4–17. Mr. Seigel testified that at that time, he was still deciding whether certain costs submitted by the Insured were hurricane-related costs that Underwriters was required to pay under the Policy, or costs for non-hurricane-related work such as repairing design defects, which were to be paid by the Insured. And that is why, Mr. Seigel explained, he had not yet paid the Insured the remainder of their Policy limit in January 2019. Tr. II at 46:3–14. In other words, Mr. Seigel testified, "costs [were] still coming in and being presented and adjusted. So, I never said that we finished the adjustment in January '19." Tr. II at 52:11–13.

After January 2019, Plaintiff's costs "spiraled" from $1,154,000 to at least $1,750,000. Tr. II at 51:14–17. Mr. Seigel attributed this to the mishandling of the repairs by Polar Vortex, LLC. Tr. II at 50:16–25 ("Q. Don't you believe that if the Insured was told at that point that the [P]olicy was exhausted, that a different decision would have been made to go on and incur what turned out to be $1,750,000 in costs?" "A. I believe the Insured mismanaged their own repair job. They knew the costs incurred. They knew the [P]olicy limit."). Mr. Seigel testified that by May 2019, Underwriters had paid out $860,000, but they would not pay the remainder of what was due until they had a signed release from Polar Vortex, LLC. Tr. II at 55:2–8. Mr. Seigel was asked why, in June 2019, he gave partial proof of costs rather than pay the entire Policy, and he responded, "I

don't know." Tr. II at 56:13–15. He agreed there was still at least $9,962 that had not been adjusted at that time, but he commented that in the context of a Policy with a million-dollar limit, it was "not significant." Tr. II at 56:19–22.

On June 19, 2019, Polar Vortex, LLC, through legal counsel, emailed Mr. Seigel informing Underwriters that the Polar Vortex was now a Constructive Total Loss and attached a Notice of Tender of Abandonment and Proof of Loss. Ex. J-282; Tr. II at 26:13–24. Upon receiving this email, Mr. Seigel contacted legal counsel for Underwriters, and testified that he did not "take any further steps to attempt to adjust the claim." Tr. II at 27:18–25. Mr. Seigel further testified, "the Insured had elected to repair this Vessel, and now the costs are exceeding the Policy limit. So, we've settled the majority of that Policy limit, so we paid them the vast majority of that sum due under the Policy. And they're now saying to us it's a [C[onstructive [T]otal [L]oss." Tr. II at 27:25–28:5. He further explained, "our position is, we've exhausted [P]olicy limits. Let's settle the remaining balance and reject the notice of abandonment. Because [] Underwriters don't take ownership of vessels. This is not our property. We don't take on the liabilities of ship owners. So, we would be rejecting this tender and settling the remaining amounts due under the [P]olicy." Tr. II at 28:6–12.

Mr. Seigel also testified, "when the tender for the notice of abandonment had been served on us [in June 2019], the claim had already been finalized. We were just trying to clarify the exact settlement sums that were due. We weren't adjusting the claim at that point, the claim had already been adjusted." Tr. I at 60:14–18. In other words, he explained, "after we[] finalized the claim and closed it effectively in terms of numbers, before we communicate[d] that to the insured and offer[ed] the balance due, [] the notice of abandonment [was] tendered." Tr. I at 66:2–6. Mr. Seigel agreed, however, that Neil Maclaren, the surveyor reporting to Mr. Seigel, was soliciting updated invoices from Bosch Marine, the repair contractor and project manager, after the initial

tender was filed.  Tr. I at 129:7–11.  But that adjustment was never given to Plaintiff.  Tr. I at 129:20–22.

While Mr. Siegel maintained that the claim had already been adjusted by the time Polar Vortex, LLC submitted a Notice of Tender of Abandonment and Proof of Loss, he also testified that Underwriters believed Plaintiff's lawsuit was "premature" because Defendant "still had some finalization of settlement numbers" and that "[i]t's a very aggressive position to just file a lawsuit before you actually clarify what…figures you feel are due."  Tr. I at 62:8–63:1.

On July 16, 2019, counsel for Underwriters sent a letter to counsel for Polar Vortex, LLC rejecting the tender.  Ex. J-288; Tr. II at 28:17–20.  The letter indicated that the Policy has a million-dollar limit, a $50,000 hurricane deductible, and that Underwriters was willing to settle the remaining balance.  Tr. II at 29:5–7.  Mr. Seigel testified that after Underwriters rejected the tender, no one from Underwriters had any further communications with anyone from Polar Vortex, LLC regarding the adjustment of the claim.  Tr. II at 29:16–20.   Moreover, once both parties retained legal counsel, all further communications were between counsel only.  Tr. II at 29:21–24.

In August 2019, counsel for Underwriters sent Polar Vortex, LLC's counsel a final proof of loss for the first time.  Tr. II at 38:6–12.  As noted previously, the original Complaint was filed on September 29, 2020, more than one year after Underwriters issued the final proof of loss to Plaintiff.

### b.  Neil Maclaren

Neil Maclaren is a marine surveyor and consultant with approximately thirty years of experience who was retained by Underwriters to survey the Polar Vortex when it was damaged and report back to Mr. Seigel.  Tr. II at 60:1–25.  Mr. Maclaren testified that he initially looked at the preliminary survey of the Polar Vortex, looked at the boat itself, met with the captain of the boat who presented what he thought was the scope of the damage, and provided his own email

survey to Underwriters.  Tr. II at 65:15–24, 67:3–8.  Mr. Maclaren also explained that while it was not his job to oversee repairs, he was responsible for ensuring that the repairs came in at a price that was fair and reasonable as presented by Polar Vortex, LLC, and relay that information to Mr. Seigel.  Tr. II at 70:2–9.  In other words, he was the "eyes and ears of the Underwriters."  Tr. II at 78:19–20.

In January 2019, Polar Vortex, LLC expressed frustration with the repair and claims process to Mr. Maclaren.  On January 19, 2019, Carey Drangula, on behalf of Polar Vortex, LLC, wrote an email to Mr. Maclaren and the repairer, Ockert Bosch.  Ex. J-15.  The email requested items for completion, cost, and ETA on remaining repairs from Mr. Bosch as well as information from Mr. Maclaren as to when Polar Vortex, LLC would receive payment from Underwriters.  *Id.* The email states, "Neil, I understand from Rob that we have not received any significant insurance reimbursements as of late.  What is the delay?  When can we expect our next payment?  This is incredibly frustrating on our end as we have paid significant sums of money to Ockert, the boatyard, etc., however, have only been reimbursed for 35% of our expense.  Please provide me with an update ASAP."  Ex. J-15 at 3–4.  Mr. Maclaren responded to the email that same day, explaining, "I am working with Robert and Ockert and have the other day been sent a list of invoices that for whatever reason slipped through the net."  Ex. J-15 at 3.  The next day, January 20, 2019, Ms. Drangula wrote back, "[w]ith all due respect, Neil, we are $708,763.41 out of pocket to date—and that figure will only increase.  By the most recent calculations, we have paid close to $150,000 for salvage and transport, $135,000 in yard fees and $821,000 to Ockert.  Let me remind you that our [P]olicy limit is $950,000 and it is unclear what amounts will be categorized as 'sue and labour.'  At the end of the day, we appear to be in the most compromised position, which only increases my frustration with this process."  Ex. J-15 at 3.

Mr. Maclaren prepared a spreadsheet dated January 26, 2019—approximately one week after this email exchange—which shows that the suggested claim-related costs combined with prorated costs totaled $967,969.  Ex. J-120; Tr. III at 20:18–24.  Mr. Maclaren explained that he did not provide Ms. Drangula with these figures at that time because they were merely his calculations and still had to be adjusted by Underwriters.  Tr. III at 21:10–11.

Later, in June 2019, Mr. Maclaren learned that Polar Vortex, LLC had stopped paying Bosch Marine for repairs and that Polar Vortex, LLC was now represented by an attorney.  Tr. III at 22:6–14.  At that time, Mr. Maclaren testified, he was told by Underwriters to "stop doing anything."  Tr. III at 22:24–25.  But Mr. Maclaren explained that during that time, he was still "tidying [] up" his spreadsheets and asking Mr. Bosch "to clarify areas on the invoices that had been presented."  Tr. III at 24:1–4.  For example, Mr. Maclaren received an estimate from Bosch Marine in June 2019 stating that it would cost an additional $154,884 to complete the boat.  Tr. III at 30:18–32:2; Ex. J-38. Mr. Maclaren testified that he passed on this information and inserted the data into his spreadsheet. Tr. III at 31:1–6.  In doing so, he divided the repair estimate between owners' costs and Underwriters' cost because he believed that it was the prudent thing to do since the claim was still open.  Tr. III at 31:7–15.  The July 18, 2019 spreadsheet, Ex. J-129, was the last spreadsheet Mr. Maclaren prepared for the Polar Vortex claim, and after July 2019, Mr. Maclaren had no further involvement in monitoring repair costs for the Polar Vortex.  Tr. III at 77:7–22, 79:1–3.

### c.  Carey Drangula

Carey Drangula is a corporate lawyer who testified as the corporate representative for Polar Vortex, LLC.  Tr. III at 95:20–96:2.  Throughout the claims handling process, Ms. Drangula was Polar Vortex, LLC's point of contact for Mr. Seigel and Mr. Maclaren.  Tr. III at 164:3–6.  Ms.

Drangula testified about her communications with Mr. Seigel, Mr. Maclaren, Bosch Marine, and others involved with the Polar Vortex repairs.

Between May and June 2019, the repair process had "broken down significantly." Tr. IV at 22:15–18. Ms. Drangula explained that Polar Vortex, LLC stopped paying Bosch Marine once the bills became greater than the value of the Polar Vortex itself. She explained that they "had already paid Bosch Marine close to $900,000, and [Bosch Marine] had provided us with invoices for another $378,000. So, although we had been directed to pay invoices, and they would ultimately be reviewed by the surveyor and Underwriters, you know, enough is enough. We had a boat that was still significantly damaged, and in a state of disrepair, and the total amount now [] would put us at 1.2 million, which is more than we actually paid for the boat." Tr. III at 128:1–8.

On June 28, 2019, Bosch Marine offered Polar Vortex, LLC to complete the job for $154,884.09. Tr. IV at 23:1–10; Ex. J-817. Ms. Drangula testified that she "believe[d] that there was a substantial amount of work that remained to be done in excess of $155,000." Tr. IV at 23:15–16. After receiving this invoice, Polar Vortex, LLC was "questioning" the work that Bosch Marine had already completed, "lost faith" in Bosch Marine's ability to complete the work, and given that "Neil Maclaren had gone silent," Plaintiff was "at a stopping point." Tr. IV at 24:6–15.

Polar Vortex, LLC then hired an individual named Matthew Schmahl to review the amounts that it had paid to Bosch Marine to date, look at the boat itself, and determine whether the amounts they had paid added up to the work that had been performed on the Vessel. Mr. Schmahl concluded it did not and advised Polar Vortex, LLC that they had been "fraudulently billed, and that the boat was in a significant state of disrepair." Tr. III at 128:19–129:6.

After this, Polar Vortex, LLC did not pay Bosch Marine the $378,000 outstanding balance, and Bosch Marine filed a lawsuit against Polar Vortex, LLC and arrested the Vessel. Tr. III at 129:7–10. In response, Polar Vortex, LLC filed counterclaims alleging fraudulent billing and

misrepresentation of the work that had been done.  Ms. Drangula testified, "[u]ltimately, Bosch Marine dropped the lawsuit.  I believe that they wound up paying the custodial fees that were owed.  Quite candidly, we would have pursued our counterclaims against Bosch Marine.  We felt very strongly about them.  But we also thought it would be, like, drawing blood from a stone and it would be a waste of our time and money because we would not be able to recover any amounts from Bosch."  Tr. III at 129:20–130:1.

Ms. Drangula was questioned by both parties about "global settlement" conversations among Polar Vortex, LLC, Bosch Marine, and Underwriters that occurred prior to the instant lawsuit.  *See, e.g.*, Tr. IV at 28:3–29:18.[1]  On October 22, 2019—after both parties had obtained legal counsel—Polar Vortex, LLC received an email from counsel on behalf of Underwriters.  Ex. J-289; Tr. III at 134:6–8.  The email provides, "in exchange for signing the release, Polar Vortex, [LLC] shall be paid the remaining hull [P]olicy, which is 83,831."  *Id.*  Ms. Drangula testified that while this did not include funds for sue and labor, by signing the release, Polar Vortex, LLC would have to give up its claims for sue and labor.  Tr. III at 135:6–10.  "There was no way we were going to sign this release," she explained.  Tr. III at 135:11–12.  Ms. Drangula testified as to another offer received from Underwriters on October 17, 2019, which Polar Vortex, LLC also rejected.  Tr. III at 136:18–137:8; Tr. IV at 29:11–18; Ex. J-290.

## **FINDINGS OF FACT**

Based on the testimony summarized above and the exhibits in evidence, the Court makes the following dispositive findings of fact.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333 as the action involves a marine insurance contract.  *See* Stip. at 5.

---

[1]  The Court notes that while settlement discussions are often inadmissible, *see* FED. R. EVID. 408, the parties each waived any such objections by introducing into evidence emails containing settlement communications and eliciting testimony regarding settlement efforts.  *See Barker v. Niles Bolton Assocs., Inc.*, 316 F. App'x 933, 936 (11th Cir. 2009).

Between the dates of September 5 and September 6, 2017, Hurricane Irma struck the island of St. Thomas, U.S. Virgin Islands.  Stip. ¶ K at 6.  During the hurricane, a 2014 57' Fontaine Pajot catamaran called the Polar Vortex broke loose from her mooring and was damaged.  *Id.*  The Polar Vortex was owned by Polar Vortex, LLC, a U.S. Virgin Islands limited liability company.  Stip. ¶¶ A–B at 5.  The Vessel was insured by Underwriters under Marine Yacht Insurance Policy No. YHL1700840 from February 23, 2017, through February 23, 2018.  Stip. ¶ C at 6.

The parties do not dispute the express terms of the Policy.  The parties have stipulated that the following relevant terms are contained in the Policy:

- the Policy included Hull & Machinery coverage (Agreed Value) of $1,000,000 and Protection & Indemnity coverage of $1,000,000;

- the Policy included separate coverage for each of the Vessel's tenders and for sue and labor;

- the Policy defines a Constructive Total Loss as a loss in which the "expense of recovering and repairing the [V]essel shall exceed the amount of insurance on hull and machinery;"

- the Policy deductible clause provides that the deductible amount shall not apply in the event of a Total Loss or Constructive Total Loss, unless the Vessel is damaged as a result of a named windstorm, in which case a $50,000 deductible shall apply.

*See* Stip. ¶¶ D–I at 6.  In other words, the Polar Vortex was insured for one million dollars.  After subtracting the windstorm deductible, the Policy provided that Polar Vortex, LLC could be reimbursed up to $950,000 for hurricane-related repairs, or if the Polar Vortex was deemed a Constructive Total Loss, Polar Vortex, LLC could recover $950,000 without attempting repairs. *See id.*

The Policy contains a limitations period shortening the time to file claims against Underwriters to one year, stating as follows:

TIME FOR SUIT AGAINST THE INSURERS

> No suit or action on this Policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all the requirements of this Policy, nor *unless commenced within one (1) year from the date of the happening or the occurrence out of which the claim arose*, provided that where such limitation of time is prohibited by the laws of the state wherein this Policy is issued, then, and in that event, no suit or action under this Policy shall be sustainable unless commenced within the shortest limitation permitted under the laws of such state.

Ex. J-184 at 2 (emphasis added). The Court finds that both parties had knowledge of the terms of the Policy at all relevant times.

Ian Seigel was the claims representative and adjuster for Underwriters with respect to the Policy issued to Polar Vortex, LLC. Tr. I at 51:5–9. When the Polar Vortex was damaged by Hurricane Irma, representatives from Polar Vortex, LLC reached out to Mr. Seigel regarding the loss. Tr. I at 147:3–8. Throughout the claims handling process, Ms. Drangula was Polar Vortex, LLC's point of contact for Mr. Seigel and Underwriters. Tr. III at 164:3–6.

Once the Polar Vortex was damaged in St. Thomas, a surveyor, Will Howe, initially inspected the Vessel and prepared a preliminary report on the damage. Tr. I at 152:24–153:10; *see* Ex. J-28. After Mr. Howe's inspection, the Polar Vortex was transported from St. Thomas to Fort Lauderdale, Florida to be repaired. At that time, Ms. Drangula, on behalf of Polar Vortex, LLC, and Mr. Seigel, on behalf of Underwriters, discussed what the Insured was to do with the Polar Vortex. *See* Tr. I at 147:3–8. Though there was much testimony on the topic, the Court need not determine which party decided to repair the Vessel nor which party decided to send the Vessel to Fort Lauderdale to resolve the issue presently before it. Ultimately, Polar Vortex, LLC hired a company called Bosch Marine to repair the Vessel and manage the repair process.

Underwriters sent a surveyor, Neil Maclaren, to serve as the "eyes and ears" on the ground for Defendant.  Tr. II at 78:19–20.

Repairs were made from approximately November 2017 through May 2019.  During this time, Bosch Marine made repairs and billed Polar Vortex, LLC; in turn, Polar Vortex, LLC paid the bills and sent the invoices to Mr. Maclaren to review and ensure that the repairs came in at a price that was fair and reasonable.  Tr. II at 70:2–71:1; Tr. IV at 10:14–19.  Mr. Maclaren then added the invoices to a spreadsheet that he sent to Underwriters.  Tr. II at 71:12–18.

Initially, Mr. Howe estimated that the damage would cost $395,000 to repair and an additional $45,000 to salvage the Vessel.  Tr. I at 152:1–7.  Thus, the parties originally expected that repairs would not exceed the Policy limit.  *Id.*  However, by January 2019, it became clear to both parties that the cost of repairs had exceeded the Policy limit.  Tr. II at 44:16–45:6, 51:14–17; Tr. IV at 14:16–19.  Mr. Maclaren explained to Ms. Drangula at that time that if there were any repairs related to manufacturing defects, rather than hurricane damage, those would not be covered under the Policy.  Tr. IV at 14:20–24.  However, Mr. Maclaren explained to Ms. Drangula that Underwriters was still adjusting the claim; that is, they were still deciding which costs were hurricane-related, and which were not.  *Id.*

Plaintiff submitted a formal Notice of Tender of Abandonment and Sworn Proof of Loss to Underwriters on June 17, 2019.  Stip. ¶ S at 7.  The Notice of Tender of Abandonment was submitted to Underwriters via email to Mr. Seigel from Plaintiff's counsel.  Ex. J-282.  The Notice includes a chart listing Plaintiff's expenses as of that date, totaling $1,224,795.49.  *Id.*  The email further states that "[i]t is estimated that an additional $200,000 to $250,000 in future expense will be necessary to complete restoration of the insured watercraft to her pre-loss condition."  *Id.*  The email continues, "[b]y any measure, the boat is a [Constructive Total Loss] as defined by the Policy even after deducting any alleged betterments.  Attached is a Notice of Tender of Abandonment

and Proof of Loss executed by the insured.  Please make arrangements to accept possession and refund to the insured all sums expended on the improvident repair." *Id.*

One month later, on July 16, 2019, counsel for Underwriters sent a letter to Polar Vortex, LLC in response to the Notice of Tender of Abandonment.  Ex. J-288.  It states, "[p]lease accept this letter as Underwriters' rejection of the Insured's tender of abandonment.  As you know, Courts generally require that an Owner/Insured tender abandonment before repairs are made, rather than at the conclusion of the repair process." *Id.*  The letter continues, "[a]lthough the [V]essel is toward the end of its repairs at Lauderdale Marine Center (many of which are non-loss related and/or due to manufacturing defect), Underwriters have now agreed to declare the [V]essel a [C]onstructive [T]otal [L]oss.  Accordingly, arrangements will be made to pay the Insured the balance of coverage available under the hull and machinery [P]olicy, over and above the sums previously advanced to the Insured, up to the maximum limit of $950,000.00." *Id.*

The Court finds that at this point, Underwriters stopped adjusting the claim.  Mr. Seigel testified, "when the tender for the notice of abandonment had been served on us [in June 2019], the claim had already been finalized.  We were just trying to clarify the exact settlement sums that were due.  We weren't adjusting the claim at that point, the claim had already been adjusted."  Tr. I at 60:14–18.  The documentary evidence indicates that all claims handling ceased in July 2019 at the latest.  Underwriters' letter, Ex. J-288, indicates that Underwriters agreed the Vessel was a Constructive Total Loss.  Moreover, the last spreadsheet used for claims adjusting is dated July 2019.  Ex. J-129.  While the parties continued to email about the case in the months that followed, none of those emails indicate that Underwriters ever worked to continue adjusting the claim. Having observed the live testimony and carefully considered the relevant evidence, the Court concludes that claim adjustments ended in July 2019.

The next month, on August 12, 2019, Underwriters' counsel sent an e-mail to counsel for Polar Vortex, LLC regarding a previous discussion to declare the Vessel a Constructive Total Loss. Ex. J-289.   The email states, "I am forwarding a proposed Policyholder's Release for your consideration.   If acceptable as drafted, Underwriters will forward the balance of the available coverage ($86,831.86) in exchange for the duly executed release." *Id.*   Later, on October 17, 2019, Underwriters' counsel sent an e-mail to counsel for Polar Vortex, LLC with an updated offer.   Ex. J-290.   The email states, "[a]s we discussed last week, Underwriters are willing on a without prejudice basis to contribute funds over and above the [P]olicy's hull limits to assist the insured in reaching an amicable resolution for the outstanding repair costs with Bosch Marine."   *Id.* Underwriters ultimately offered Polar Vortex, LLC a total payment of $1,041.155 (inclusive of previous payments already made), in exchange for the Insured's release of all claims.   *Id.*

Meanwhile, Polar Vortex, LLC was engaged in litigation with Bosch Marine.   By May 2019, Polar Vortex, LLC refused to pay Bosch Marine its outstanding balance, so Bosch Marine filed a lawsuit against Polar Vortex, LLC and arrested the Vessel.   Tr. III at 129:7–10.   In response, on October 11, 2019, Polar Vortex, LLC filed counterclaims against Bosch Marine, alleging fraudulent billing and misrepresentation of the work that had been performed.   Ex. J-39.   The Court credits Ms. Drangula's testimony that Bosch Marine dropped the lawsuit and paid the custodial fees owed.   Ms. Drangula did not disclose whether there was a settlement agreement between Polar Vortex, LLC and Bosch Marine, and the Court makes no findings in this regard.   However, the Court relies on Ms. Drangula's testimony that Polar Vortex, LLC did not pursue their counterclaims against Bosch Marine because they "thought it would be, like, drawing blood from a stone and it would be a waste of our time and money because we would not be able to recover any amounts from Bosch."   Tr. III at 129:20–130:1.   Ultimately, Bosch Marine and Polar Vortex,

LLC filed a Notice of Settlement on August 14, 2020.  *See Bosch Marine Yacht Services LLC v. S/V POLAR VORTEX, et al.*, No. 19-62105, [ECF No. 72] (S.D. Fla. 2020).

Polar Vortex, LLC renewed its Notice of Tender of Abandonment in August 2020, and Underwriters once again rejected the renewed Notice in September 2020.  Stip. ¶¶ T–U at 7.  Plaintiff filed its Complaint in this case on September 29, 2020.

## CONCLUSIONS OF LAW

Having considered the evidence submitted to the Court and presented at trial, the Court finds that Plaintiff's case is time-barred.  The Policy imposes a one-year limitations period as to all four of Plaintiff's remaining claims, and the evidence does not support Plaintiff's argument that the "continuing violations doctrine" tolls the limitations period.[2]

### I.   The Limitations Period for Plaintiff's Claims was One Year

The Policy imposes a one-year limitations period, requiring "an action on this Policy" be "commenced within one (1) year from the date of the happening or the occurrence out of which the claim arose[.]"  Ex. J-184 at 2.  Following the MTD Order, four counts remained pending against Underwriters: (1) Breach of Contract for Failure to Accept Tender of the Vessel (Count I); (2) Negligent Failure to Adjust Claim for Polar Vortex (Count II); (3) Breach of Duty of Utmost Good Faith and Fair Dealing (Count IV); and (4) Misrepresentation (Count V).  The Court finds the one-year limitations period in the Policy applies to all of Plaintiff's remaining claims.  *Exec. Plaza, LLC v. Peerless Ins. Co.*, 5 N.E.3d 989, 992 (2014) (Under New York law, "[a]n agreement which modifies the Statute of Limitations by specifying a shorter, but reasonable, period within which to commence an action is enforceable.").

---

[2] Pursuant to the Choice of Law Clause in the Policy, Plaintiff's claims are governed by the well-established principles and precedents of admiralty law and, where no such precedent exists, by the substantive laws of New York.  *See* MTD Order at 7.

Under New York law, "parties to a contract may designate a reasonable period of limitations within which a claim arising out of the contract is to be commenced." *N. Am. Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc.*, 477 F. Supp. 2d 576, 582 (S.D.N.Y. 2006). "New York courts have held that a one-year time limitation to bring suit for breach of an insurance contract is reasonable and enforceable." *Id.* To find a limitations period unreasonable, New York courts look to whether it would be impossible for the plaintiff to bring a suit in the allotted time. *Exec. Plaza*, 5 N.E.3d at 992 ("It is neither fair nor reasonable to require a suit within two years from the date of the loss, while imposing a condition precedent to the suit—in this case, completion of replacement of the property—that cannot be met within that two-year period."). Additionally, "[t]he defendant has the initial burden of establishing that the limitations period in the policy expired prior to the commencement of the action." *Mitsui Sumitomo*, 477 F. Supp. 2d at 582.

In light of New York law and the circumstances surrounding this case, the Court finds the one-year limitations period is reasonable. Polar Vortex, LLC's counterclaims against Bosch Marine, filed in October 2019, demonstrate that it was possible for Polar Vortex, LLC to bring a suit over the loss within the limitations period. *See* Ex. J-39. Additionally, the evidence establishes that Polar Vortex, LLC hired counsel to communicate with Underwriters' counsel as early as June 17, 2019. *See* Ex. J-282. These circumstances demonstrate that Plaintiff had the ability to bring this suit within the limitations period.

Moreover, the Court finds Defendants have met their initial burden of establishing that the one-year limitations period expired prior to the filing of this suit. To reach this conclusion, the Court examines the timeline of events. The loss occurred in September 2017. Repairs of the Vessel began in November 2017 and ceased in May 2019. Ex. J-26. During this period, Underwriters adjusted the claim and paid Polar Vortex, LLC for repairs already adjusted. Polar Vortex, LLC submitted to Underwriters a formal Notice of Tender of Abandonment and Sworn

Proof of Loss on June 17, 2019. Ex. J-282. On July 16, 2019, Underwriters' counsel sent a letter to Polar Vortex, LLC agreeing that the Polar Vortex was now a Constructive Total Loss. Ex. J-288. The last spreadsheet upon which Mr. Maclaren listed costs submitted by Polar Vortex, LLC is the July 2019 spreadsheet. Ex. J-129. Polar Vortex, LLC and Underwriters exchanged emails regarding settlement offers between July and October 2019. *See* Ex. J-289; Ex. J-290. In August 2020, Polar Vortex, LLC renewed its Notice of Tender of Abandonment. Stip. ¶ T at 7. In September 2020, Underwriters rejected this renewed Notice. Stip. ¶ U at 7. Plaintiff filed its Complaint on September 29, 2020. *See* [ECF No. 1].

The Court finds that the last event that purportedly triggered the limitations period occurred in July 2019, over one year before Plaintiff filed the instant suit.[3] It was in July 2019 that Underwriters last adjusted any claims, and it was in July 2019 that Underwriters agreed the Vessel was a Constructive Total Loss—but nevertheless rejected Plaintiff's Notice of Tender.[4] At that time, all of the events underlying Plaintiff's claims had already occurred. Thus, Plaintiff had until July 2020 to bring suit. But rather than bring suit against Underwriters, Polar Vortex, LLC litigated counterclaims against Bosch Marine for approximately a year. Accordingly, Defendant has shown that the events that form the basis of Plaintiff's claim occurred more than one year before the case was filed, outside the limitations period.

---

[3] The Court does not reach the question of whether Defendant breached its contract. Therefore, the Court assumes without deciding that Defendant's actions prior to July 2019 may have constituted a breach for purposes of analyzing the contractual limitations period.

[4] Throughout the pendency of this action, Plaintiff has made much of deposition testimony in which Mr. Seigel, Defendant's Rule 12(b)(6) witness, testified that he believed Plaintiff's lawsuit was "premature," to suggest that Underwriters was still adjusting Plaintiff's claim when Plaintiff filed this suit. *See, e.g.*, Ex. J-238 at 125:5–24. However, having carefully weighed this deposition testimony against the documentary evidence introduced at trial and live trial testimony, the Court finds that the deposition testimony does not warrant a finding contrary to the surmounting evidence establishing that Underwriters did not further adjust Plaintiff's claim after July 2019.

## II.  The Continuing Violations Doctrine Does Not Toll the Limitations Period

Plaintiff contends that the "continuing violations doctrine" tolls the contractual limitations period in the Policy.  Plaintiff argues that its renewed Notice of Tender of Abandonment in August 2020, which Defendant rejected, along with Defendant's continued adjustments of the claim, constituted new wrongs under New York law that reset the limitations period.

Once the defendant has met its burden of establishing that the limitations period in the Policy expired prior to the commencement of the action, the plaintiff has the burden "to aver evidentiary facts establishing that the case at hand falls within an exception to the limitations period." *Mitsui Sumitomo*, 477 F. Supp. 2d at 582.  There is no well entrenched federal maritime rule regarding the continuing violations doctrine, so the Court turns to New York substantive law. Under New York law, the continuing violations doctrine applies "where a contract requires continuing performance over a period of time, [such that] each successive breach may begin the statute of limitations running anew."  *See Lotwala v. Dhabuwala*, 2022 NY Slip Op 32639(U), ¶ 6 (N.Y. Sup. Ct. 2022) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 150 (2d Cir. 2007)).  The doctrine is predicated on "continuing wrongful actions" as opposed to "continuing *effects* of earlier wrongful conduct." *Id.* (emphasis added).  The continuing violations doctrine "divides what might otherwise represent a single, time-barred cause of action into several separate claims, at least one of which accrues within the limitations period prior to suit." *Id.* (quoting Kyle Graham, *The Continuing Violations Doctrine*, 43 GONZ. L. REV. 271, 275, 326 (2008)).

In *Guilbert*, the Second Circuit, applying New York law, found that the continuing violations doctrine applied where the initial breach of contract may have occurred outside the statute of limitations period, but because defendants had an obligation to continue contributing annually to plaintiff's pension fund, plaintiff's claim that defendants breached that obligation within the limitations period was timely. *Guilbert*, 480 F.3d at 150.

In contrast, the Second Circuit in *Miller v. Metropolitan Life Insurance Company* held that New York's continuing violations doctrine did not apply where the insured was wrongly identified as a smoker, and for sixteen years, paid a higher premium on his insurance as a result. *Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 122 (2d Cir. 2020). The court explained, "[u]nder that doctrine, where a contract provides for continuing performance over a period of time, each breach may begin the running of the statute anew such that accrual occurs continuously." *Id.* (internal citation omitted). However, it did not apply in this instance because "tolling based on the doctrine may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct." *Id.* (internal citation omitted). The court found that the initial wrongful act was defendant's wrongful designation of plaintiffs as smokers. But, the court concluded, "[a]ny subsequent premium that MetLife charged [plaintiffs] represented the consequences of that allegedly wrongful act in the form of continuing damages and was not an independent wrong in itself." *Id.* (internal citation omitted).

Here, Plaintiff has demonstrated no continuing obligation, as in *Guilbert*. Instead, the actions Plaintiff alleges occurred within the contractual limitations period consist of continuing damages stemming from the original purported breach, as in *Miller*. Consequently, these actions do not amount to independent breaches and thus cannot serve to re-start the limitations period. The Court examines this conclusion in connection with each of the four remaining claims.

### a. *Count I: Breach of Contract for Failure to Accept Tender of Vessel*

Plaintiff contends that the contractual limitations period for all counts began to run in August 2020 following Defendant's rejection of Plaintiff's second formal Notice of Tender of Abandonment. This allegation is unfounded, however, given that rejection of the second Tender did not constitute a new, independent wrong, but merely continued the effects of the original wrong (*i.e.*, the rejection of the first Tender).

In *New York Bus Operators Compensation Trust v. American Home Assurance Company*, a New York court denied the application of the continuing violations doctrine in similar circumstances. The court explained that the continuing violations doctrine serves to toll "the running of the statute of limitations to the date of the commission of the last wrongful act when there is a series of continuing wrongs" and "extend[s] the statute of limitations when the contract imposes a continuing duty on the breaching party." *N.Y. Bus Operators Comp. Tr. v. Am. Home Assurance Co.*, 71 Misc. 3d 630, 634 (N.Y. Sup. Ct. 2021). There, plaintiff claimed defendant was in breach of contract because the parties' agreement provided for "continuing performance" over a period of time and defendant's "discontinued performance" of their contractual obligations triggered the application of the continuing violations doctrine. *Id.* However, the court disagreed, concluding that "plaintiff's allegations amounted to claims of *continuing damages*" arising from defendant's actions—"not to continuing breaches" of contractual obligations. *See id.* (emphasis added).

Similarly, in *Roslyn Savings Bank v. National Westminster Bank*, plaintiff alleged that defendant breached an "Account Reconciliation Agreement" by failing to provide a service envisioned by their agreement. *See Roslyn Sav. Bank v. Nat'l Westminster Bank USA*, 699 N.Y.S.2d 421, 422 (1999). The Court held that plaintiff's reliance on the continuing violations doctrine was "misplaced" and ruled that plaintiff's claim was untimely. *Id.* The court reasoned that a "repetition" of the alleged injury (in this case, failure to provide check reconciliation services) did not start "the claim to accrue anew." *Id.* The court found that plaintiff had filed suit over six years after the statute of limitations had lapsed, and defendant's "repetition of this discrepancy" over the years did not amount to a separate breach that would otherwise allow for the continuing violations doctrine to apply. *Id.*

Here, Underwriters' rejection of the first Tender of Abandonment in July 2019 constitutes the last wrongful act for purposes of determining the applicability of the continuing violations doctrine. Underwriters' rejection of the second Tender of Abandonment in August 2020, as in *New York Bus Operators*, did not constitute a "continuing breach" of its contractual obligations— it was, at most, a "continuing damage" from the previous rejection of the Tender of Abandonment in July 2019. *See N.Y. Bus Operators*, 71 Misc. 3d at 634.

Polar Vortex, LLC argues that Underwriter's repeated rejection of their second identical Tender of Abandonment in August 2020 constituted a separate breach. But, like the "repetition of [] discrepancy" in *Roslyn Savings Bank*, Polar Vortex, LLC's second Tender—submitted over three months after the limitations period had lapsed—simply "repeated" the initial Tender, and was similarly rejected by Underwriters. Thus, it fails to amount to a "separate breach" that would start the "claim to accrue anew." *Roslyn Sav. Bank*, 699 N.Y.S.2d at 422. Indeed, mistakenly characterizing the second Tender as a "separate breach" in lieu of a "continuing damage" would allow an insured to re-start the limitations period at will by simply re-submitting a duplicative Notice of Tender of Abandonment at any time. Such a result would render the limitations period in the Policy meaningless. Thus, the continuing violations doctrine does not apply to Underwriters' alleged failure to accept the second Tender of Abandonment.

### b. *Counts II and IV: Negligent Failure to Adjust Claim and Breach of Duty of Utmost Good Faith and Fair Dealing*

The continuing violations doctrine does not apply to extend the time for Polar Vortex, LLC to file their claim for "negligent failure to adjust the claims for the Polar Vortex" (Count II) or "breach of duty of utmost good faith and fair dealing" (Count IV). *See* Compl. at 17, 19. In Count II, Polar Vortex, LLC alleges that Underwriters "negligently failed to reasonably, properly, and prudently adjust the claim for damage to the Polar Vortex." *Id.* at 17. In Count IV, Polar Vortex, LLC alleges that Underwriters "breached its duty of good faith and fair dealing by failing to

truthfully and honestly communicate with the insured as to the scope of loss and damage to the [V]essel and in its adjustment of the claim." *Id.* at 20.

In *Miller*, the Second Circuit explained that the continuing violations doctrine did not apply to counts analogous to those here, including claims for "contractual breach of the implied covenant of good faith and fair dealing, tortious breach of the duty of good faith and fair dealing, and negligence." *Miller*, 979 F.3d at 121. The court reasoned that defendant's designation of plaintiffs as smokers (which led to higher premiums) was the "original" wrongful action that started the limitations clock. *Id.* at 124. Thus, subsequent wrongs—charging plaintiffs for those premiums— constituted "consequences" of the original wrongful act, as opposed to "independent wrongs" sufficient to trigger the application of the continuing violations doctrine. *Id.* Accordingly, the court dismissed plaintiff's claims, finding them "plainly time-barred under New York law." *Id.*

Here, the last potentially wrongful action that started the contractual limitations period was Underwriters' rejection of the first Notice of Tender of Abandonment on July 16, 2019. Under the Policy, Polar Vortex, LLC had one year to file any claims from that date. But Plaintiff brought its claims after this limitations period lapsed. And neither count constitutes a continuing violation.

First, neither of the alleged wrongs in these counts occurred between July 16, 2019 and July 16, 2020. For the doctrine to apply, Polar Vortex, LLC must show "a series of related acts, one or more of which falls within the limitations period" that "may not be based on the continuing effects of earlier unlawful conduct." *Day v. Moscow*, 769 F. Supp. 472, 477 (S.D.N.Y. 1991), *aff'd*, 955 F.2d 807 (2d Cir. 1992). Here, the record shows that after the rejection of the first Tender on July 16, 2019 and the filing of Polar Vortex, LLC's untimely suit, (1) no further adjustments were made to the claim, (2) no work was performed on the Polar Vortex, and (3) communications between the parties ceased but for sporadic exchanges between counsel. Both the alleged "negligent failure to adjust" and "breach of utmost good faith" claims pertain to acts

that preceded rejection of the first Tender, which initiated the contractual limitations period on July 16, 2019.  As a result, these two counts are time-barred since they are rooted in alleged wrongs that occurred prior to—not during—the limitations period.

Since no further adjustments were made, and no communications between the parties occurred after July 16, 2019, the continuing violations doctrine does not apply to reset the limitations period for either of these counts.  Hence, Polar Vortex, LLC's allegations against Underwriters for "negligently failing to adjust the claim" and "breaching the duty of utmost good faith" do not trigger the continuing violations doctrine.

### c.   Count V: Misrepresentation

Plaintiff contends that Underwriters made "false representations" regarding the nature and coverage of the damage and reparability of the Vessel, which Polar Vortex, LLC reasonably "rel[ied] on" and was "damaged as a result thereof."  Compl. at 22.  These claims also fail to trigger the applicability of the continuing violations doctrine.

In *Pike v. New York Life Insurance*, plaintiffs alleged that they purchased insurance policies "in reliance upon the advice of and in consultation with the defendant," that they "were not knowledgeable or experienced" in purchasing such products, and "relied on the advice of defendants" who "knew" and took advantage of their "lack of knowledge" to "fraudulently" induce them, "resulting in financial loss."  *Pike v. New York Life Ins. Co.*, 901 N.Y.S.2d 76, 81 (2010).  When confronted with a time-bar challenge, plaintiffs invoked the continuing violations doctrine, asserting that a new wrong arose every time a premium was paid.  *Id.*  The court dismissed these claims and held that plaintiffs failed to "point to any specific wrong that occurred each time they paid a premium, other than having to pay it."  *Id.*  The court explained that wrongs would have accrued "at the time of purchase of the policies, not at the time of payment of each premium."  *Id.*

Here, the contract limitations period began when Defendant rejected the initial Tender of Abandonment on July 16, 2019.   There was no evidence presented at trial that Underwriters made any misrepresentations (or representations at all, for that matter) after July 16, 2019.   As in *Pike*, Polar Vortex, LLC has failed to point to any subsequent specific wrong sufficient to restart the limitations period.   Indeed, after the rejection of the Tender of Abandonment, there were no further adjustments, no further work was performed on the Vessel, and only sporadic communications transpired between the parties.   Consequently, the Court finds that no misrepresentations were made by Underwriters within the one-year limitations period established by the Policy, and the continuing violations doctrine does not apply.

## **CONCLUSION**

In sum, having carefully listened to the testimony of the witnesses at trial and reviewed all exhibits admitted into evidence, the Court finds that Plaintiff's claims are time-barred and not tolled by the continuing violations doctrine under New York law.   Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Final Judgment is entered in favor of Defendant, Certain Underwriters at Lloyd's of London Subscribing to Policy Number YHL 1700840, and against Plaintiff, Polar Vortex, LLC.   Plaintiff shall take nothing by this action and Defendant shall go hence without day.   The Court will enter a separate judgment in accordance with Federal Rule of Civil Procedure 58.

**DONE AND ORDERED** in Miami, Florida, this 27th day of September, 2023.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**